UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                  :
THOMAS M. WILLIAMS,                               :
                                                  :
                        Plaintiff,                :        04 Civ. 7588 (GEL)
                                                  :
        v.                                        :        **OPINION AND ORDER**
                                                  :
DEUTSCHE BANK SECURITIES, INC.,                   :
                                                  :
                        Defendant.                :
                                                  :
-------------------------------------------------------------x

William Dunnegan, Megan L. Martin, Perkins &
Dunnegan, New York, NY; Michael Eagan, San
Francisco, CA, of counsel, for plaintiff.

Kenneth I. Schacter, Bingham McCutchen LLP,
New York, NY; Paul J. Schumacher, Jennifer J. Holder,
Bingham McCutchn LLP, of counsel, Los Angeles, CA,
for defendant.

GERARD E. LYNCH, District Judge:

        Plaintiff Thomas M. Williams brings this action against Deutsche Bank Securities, Inc.

("DBSI"), a national securities brokerage company. Plaintiff alleges that defendant gave

improper advice in recommending a forward sale transaction, and brings claims for breach of

fiduciary duty, negligent misrepresentation, constructive fraud, and negligence. Plaintiff also

brings a claim of unfair competition under the California Business and Professions Code §

17200. Defendant moves to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure,

for failure to state a claim upon which relief can be granted, arguing that the choice of law

provision in the Forward Sale Contract governs, and that New York law precludes most of

plaintiff's claims. Plaintiff moves for transfer of venue to the Northern District of California.

For the reasons stated below, the motion to dismiss will be granted in part and denied in part, and the motion to transfer will be denied.

## BACKGROUND

The facts stated below are taken from plaintiff's complaint, the allegations of which must be accepted as true for purposes of this motion.

Williams is an individual investor resident in California, who has a longstanding relationship with Deutsche Bank Alex.Brown ("DB Alex.Brown"), a division of DBSI, a national firm that does business in San Francisco. (Compl. ¶¶ 4, 5.) For many years prior to the transaction at issue, DB Alex.Brown advised Williams on financial and investment matters.[1]

Through various business transactions, Williams acquired a significant number of shares in Cisco Systems, Inc. ("Cisco"), which Williams deposited with DB Alex.Brown. (Compl. ¶ 6.) Based on advice from DB Alex.Brown, Williams borrowed against his Cisco shares, permitting him to obtain additional liquidity, but also subjecting him to margin calls upon a decline in the price of the Cisco shares. (Id.) By September 2002, the price of Cisco stock, which had once traded at $80 per share, had fallen to $10.58, triggering the margin calls and forcing Williams to provide cash to DB Alex.Brown to cover the margin loans taken against the Cisco shares. (Compl. ¶ 7.) Williams believed the stock was undervalued and did not want to sell his shares to raise cash. (Id.)

In late September 2002, Williams sought to obtain liquidity to cover the margin calls, while maintaining his ability to benefit in the "upside" of Cisco stock, if the price were to

_____

[1] Defendant notes that Williams also retained Perry Olson of the Portola Group, an investment advisory firm, to act as his agent in directing his investments. (D. Mem. 5 n.4.)

increase again, as Williams believed it would.  (Compl. ¶ 8.)  John Maierhofer, an Investment

Representative in DB Alex.Brown's San Francisco office, proposed a strategy known as a

"Forward Sale Contract."  (Id.)  Williams asserts that DB Alex.Brown advised him that the

Forward Sale Contract would allow him to meet his goals by means of a deposit of his shares,

subject to a series of pledges and option transactions to be executed through a counterparty.  (Id.)

However, Williams alleges that DB Alex.Brown failed to explain that his participation in the

"upside" potential of the Cisco shares was limited to only $2.12 per share, and that he would not

benefit from any appreciation above $12.70 per share.  (Compl. ¶¶ 10-11.)

On September 30, 2002, Williams entered into a Forward Sale Contract with Deutsche

Bank AG (Compl. ¶ 11; Schumacher Decl. Ex. A at 15), the parent company of DBSI, as

counterparty.  (D. Mem. 3 n.2.)  Williams also signed several other documents (including a

Pledge and Security Annex and Account Control Agreement) that together with the Forward Sale

Contract outlined the agreement between Williams and Deutsche Bank AG.  (See Schumacher

Decl. Exs. B, C.)  These agreements contained descriptions of the transaction, disclaimers of

various warranties, promises, and representations by Deutsche Bank AG, and a number of

representations by Williams.  The agreements also included a merger clause abrogating any prior

oral or written agreements, a choice of law clause selecting New York law to govern the

agreements, and a forum clause selecting New York as the forum of choice in disputes over the

agreement.  Williams alleges that DB Alex.Brown did not provide certain operative written

documents sufficiently prior to the transaction so that he could understand the complicated terms.

(Compl. ¶ 12.)  A Confirmation Letter, dated October 1, 2002, clarifying some terms of the

agreement, was also sent to Williams, but not until after the Forward Sale Contract was signed.

(P. Mem. 20; Schumacher Decl. Ex. D at 1.)

As a result of the Forward Sale Contract, Williams received proceeds equal to 87.40% of the Cisco share price of $10.58 (Compl. ¶ 11; Schumacher Decl. Ex. D at 2), totaling over $3.6 million. (Schumacher Decl. Ex. D at 2.) Subsequently, the price of the Cisco shares rose substantially, to over $20 a share.[2] (Compl. ¶ 14.) Williams asked DB Alex.Brown how he would be participating in the increased value of the Cisco shares that he had pledged under the Forward Sale Contract. Williams claims that it was only then that he learned for the first time that he would not share in any increase of the Cisco shares above $12.70 per share. (Compl. ¶ 13.)

Williams consequently filed suit in California state court, charging Maierhofer and DB Alex.Brown/DBSI with various torts, including fraud, breach of fiduciary duty, and negligent misrepresentation. The California court stayed the action in deference to a suit in New York, based on the forum selection clause. Williams then filed this suit in this Court, against DBSI as the sole defendant, asserting the same claims.

## DISCUSSION

I.     Standard on Motion to Dismiss

In the context of a motion to dismiss, the Court accepts "as true the facts alleged in the complaint," Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 699 (2d Cir. 1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Thomas v. City of New York,

---

[2] Cisco shares are currently valued at approximately $19 a share. See Flashquotes, at http://www.nasdaq.com.

143 F.3d 31, 36-37 (2d Cir. 1998) (internal citations omitted).  The "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996) (internal quotation marks and citations omitted).  However, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  Smith v. Local 819 I.B.T. Pension Plan, 291 F. 3d 236, 240 (2d Cir. 2002), quoting Gebhardt v. Allspect, Inc., 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000).

All reasonable inferences are to be drawn in the plaintiff's favor, which often makes it "difficult to resolve [certain questions] as a matter of law."  In re Independent Energy Holdings PLC, 154 F. Supp. 2d 741, 748 (S.D.N.Y. 2001).   The task of a court in ruling on a 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference.  Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).  Plaintiff argues that this suit is solely based on various tort claims and is not based on any contract.  (P. Mem. 1.)  Even accepting plaintiff's characterization, however, the contractual documents, which plaintiff did not attach to the complaint, may be considered because the agreement is referenced in the complaint and is crucial to plaintiff's claims.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (determining that documents were properly considered in a motion to dismiss as plaintiff had relied on the terms and effects of the documents, and were integral to the complaint).

Defendant's alleged fraud resulted in plaintiff entering into a contractual agreement whose terms are essential to understanding plaintiff's loss claims. Therefore, the Forward Sale Contract may be considered, along with the other documents it incorporates by reference.

II.     Choice of Law

The parties dispute whether New York or California law governs plaintiff's claims. In diversity cases, federal courts resolve conflicts of law by looking to the conflicts rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). As this suit was brought in the Southern District of New York, New York conflicts law determines whether New York or California substantive law applies.

Defendant contends that the choice of law provision in the agreement dictates the application of New York law. (D. Reply 3-6.) Plaintiff, however, asserts that the choice of law provision does not control because his complaint is based on tort, not contract, claims, and that California law is controlling. Second Circuit precedent applying New York conflicts law establishes that a choice of law provision does not dispositively determine the body of law that governs claims of fraud relating to a contract. See Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1995) (applying New York law to determine if a choice of law provision applies). In order for a contractual choice of law provision to apply to related tort claims, "the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." Id. Here, the choice of law provision is insufficiently broad to cover tort claims relating to the contract.

Certain key words can indicate that a choice of law provision is broad enough to reach related tort claims. In Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304 (2d Cir. 1994), the

6

Second Circuit held that a choice of law provision expressly stating that controversies "arising out of or relating to" the contract was sufficiently broad to include tort claims related to the contract. Id. at 310. Even if a provision lacks the specific words "arising out of," some courts have found that a choice of law provision can be applied to a tort claim if a forum selection clause also purports to cover all disputes arising out of or in connection with the contract. See, e.g., Internet Law Library v. Southridge Capital Mgmt. LLC, 223 F. Supp. 2d 474, 489 (S.D.N.Y. 2002) (applying New York law on state fraud claims where "[e]ach party . . . submits to the . . . jurisdiction of the . . . courts sitting in the City of New York . . . for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein"); Nanopierce Tech. v. Southridge Capital Mgmt. LLC, No. 02 Civ. 0767 LBS, 2002 WL 31819207, at *10 (S.D.N.Y. Oct. 10, 2002) (applying New York law where parties had agreed to jurisdiction in New York for the "adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein"); About.Com, Inc. v. Targetfirst, Inc., No. 01V1665 (GBD), 2002 WL 826953, at *1 (S.D.N.Y. April 30, 2002) (applying New York law to a fraud claim where both parties "agree[d] that any cause of action arising under this Agreement shall be brought in the state and federal courts of the State of New York"); Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc., 165 F. Supp. 2d 514, 526 (S.D.N.Y. 2001) (applying New York law to various tort claims where the "[a]greement shall be governed by the laws of the State of New York and any action arising out of this [a]greement shall be brought" in a New York court).

In contrast, contractual choice of law provisions with narrow language will not apply to tort claims. For example, in Krock, the Second Circuit found that a contract which "shall be

governed by and construed in accordance with the laws of . . . Massachusetts" could not be read broadly enough to apply to plaintiff's tort claims. <u>Krock</u>, 97 F.3d at 645. The provision did not include an accompanying forum selection clause employing "arising under" or "in connection with" language. <u>Internet Law Library</u>, 223 F. Supp. 2d at 489.[3] Courts have found provisions with even broader language than that in <u>Krock</u> too narrow to reach tort claims. <u>See</u>, <u>e.g.</u>, <u>Frazer Exton Dev., LP v. Kemper Envtl., Ltd.</u>, No. 03 Civ. 0637 (HB), 2004 WL 1752580 (S.D.N.Y. July 29, 2004) ("In the event that the [parties] dispute the meaning, interpretation or operation of any term, condition, definition or provision of this [p]olicy, or the fulfillment . . . of any other obligations with respect to the [p]olicy, resulting in litigation, arbitration or other form of dispute resolution, the [parties] agree that the law of the State of New York shall apply notwithstanding the State of New York's choice of law rules.").

Defendant here contends that the choice of law provision in the Account Control Agreement encompasses the entire relationship between Williams and Deutsche Bank AG and its affiliates because it requires the application of New York law to Williams' securities account. (D. Reply 5.) However, the language of the choice of law provision is narrow and similar to the

---

[3] Since <u>Krock</u>, other courts have found similar language to be insufficiently broad to cover tort claims. <u>See</u> <u>e.g.</u>, <u>PPI Enterprises (U.S.), Inc. v. Del Monte Foods Co.</u>, No. 99 Civ. 3794 (BSJ), 2003 WL 22118977, at *16 n.34 (S.D.N.Y. Sept. 11, 2003) ("This [a]greement shall be construed and enforced in accordance with and governed by the law of the State of Maryland."); <u>Finance One Public Co., Ltd. v. Lehman Bros. Special Fin., Inc.</u>, No. 00 Civ. 6739 (CBM), 2001 WL 1543820, at *2 (S.D.N.Y. Dec. 4, 2001) ("This agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)"); <u>Schuster v. Dragone Classic Motor Cars, Inc.</u>, 67 F. Supp. 2d 288, 290-291 (S.D.N.Y. 1999) ("The laws of New York State shall apply."); <u>Bon Jour Group, Ltd. v. Elan-Polo, Inc.</u>, No. 96 Civ. 6705 (PKL), 1997 WL 401814, at *4 n.6 (S.D.N.Y. 1997) ("The parties agree that this [a]greement shall be governed by and interpreted pursuant to the [l]aws of the State of New York.").

language analyzed in <u>Krock</u>, stating simply that "[b]oth this Agreement and the Securities Account will be governed by, and construed in accordance with, the laws of the State of New York." (Schumacher Decl. Ex. C at 2.) As the cases cited above indicate, language providing that the Agreement itself will be governed by, and construed in accordance with, a particular state's laws have regularly been construed in this circuit as applying only to disputes concerning the agreement itself and its interpretation, and not to all disputes arising from the parties' relationship. Implicitly recognizing this, defendant argues that this clause is broader, because it refers not only to the Agreement, but also to the Securities Account. However, the Securities Account referenced by the Agreement is specific to the transaction used to facilitate the Forward Sale Contract. Williams already had a securities account at DB Alex.Brown, which is not affected by this clause and is the basis of the relationship on which he brings his present tort claims. Furthermore, the clause in the Account Control Agreement has no forum selection clause. The choice of law provision in the Account Control Agreement thus cannot encompass related tort claims.

Defendants also point to another choice of law provision, contained in the Forward Sale Contract itself. That clause provides: "This Agreement and its enforcement shall be governed by, and construed in accordance with, the laws of the State of New York (without reference to choice of law doctrine)." (Schumacher Decl. Ex. A ¶ 11(a).) As in <u>Krock</u>, this provision does not use the words "arising out of" and again includes narrow language addressing the Agreement itself, its enforcement, and its construction. However, its accompanying forum selection clause, while failing to include the magic words outlined in <u>Turtur</u>, is broader. That clause states that "[a]ny legal action or proceedings with respect to this Agreement, the security interests created by the

Security Annex, or the rights and remedies of the parties" must be brought in New York. (Schumacher Decl. Ex. A. ¶ 12(a).)  The phrase "with respect to . . . the rights and remedies of parties" indicates that the forum selection provision is intended to extend beyond the mere enforcement or interpretation of the agreement itself.  (Id.)

The choice of law provision is considerably narrower than, and at any rate clearly different from, the forum selection clause.  It is therefore reasonable to assume that the parties, in utilizing different standards for the choice of law and choice of forum, had different intentions with respect to the reach of the two provisions.  But even if the choice of law provision is to be read as broadly as the forum selection clause, defendant's argument still ultimately fails.  The forum selection clause applies only to the rights and remedies of the "*parties*."  While Williams entered the Forward Sale Contract with Deutsche Bank AG (see Schumacher Decl. Ex. A at 15), the present suit is not against Deutsche Bank AG but against DBSI,[4] for alleged wrongful acts in a relationship that long pre-dates the contract.  Choice of law provisions do not apply to disputes between entities who were not parties to the contract.  United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 214 (S.D.N.Y. 2002).  See also Cromer Fin. Ltd. v. Berger, 158 F. Supp. 2d 347, 358 (S.D.N.Y. 2001) (finding that the choice of law provision in a contract between the multiple defendants did not apply to disputes between defendants and plaintiffs).

Moreover, plaintiff sues DBSI not in its role as agent for Deutsche Bank AG as counterparty to the Forward Sale Contract, but in its role, through its division DB Alex.Brown, as

---

[4] DB Alex.Brown is a division of DBSI.  (D. Mem. 3.)  DBSI is a subsidiary of Deustche Bank AG and thus a separate entity.  (D. Mem. 3 n.2.)

Williams's advisor in California. If Deutsche Bank AG and DB Alex.Brown were unaffiliated, it would be quite apparent that Williams's action against his broker and investment advisor, for poor advice as to the suitability of a transaction, is distinct from any action brought against the counterparty to the transaction, whether based on the contract governing that transaction or on fraudulent representations allegedly made by the counterparty. The present lawsuit is analogous to cases in which an investor purchases stock from a company's promoters, on the advice of his broker. Even if the stock purchase agreement contains a choice of law or forum clause broad enough to cover fraud claims as well as breach-of-contract claims against the seller, there is no basis for holding that the agreement governs tort (or even contract) claims against the broker for advising an unsuitable investment. Therefore, the clause in the Forward Sale Contract does not govern claims arising out of Williams' longstanding brokerage relationship with DB Alex.Brown/DBSI.

Absent a controlling choice of law provision, New York utilizes an interest analysis to determine the law governing a claim, requiring application of the law of the jurisdiction having the greatest interest in the litigation. Krock, 97 F.3d at 645. For "issues relating to tort claims, 'the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort.'" Tucker v. Janney Montgomery Scott, Inc., No. 96 Civ. 1923 (LLS), 1997 WL 151509, at *5 (S.D.N.Y. April 1, 1997), quoting Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 197 (1985). Here, Williams is a resident of California. While DBSI is incorporated in Delaware and has its principal place of business in New York, DB Alex.Brown and Maierhofer are located in California, and the tortious conduct alleged by plaintiff took place in California. Therefore, California law governs Williams's claims.

III.    <u>Breach of Fiduciary Duty</u>

Defendant argues that under New York law, a fiduciary duty can arise between a stockbroker and a customer "only where the customer has delegated discretionary trading authority to the broker." <u>Independent Order Of Foresters v. Donald, Lufkin & Jenrette, Inc.</u>, 157 F.3d 933, 940 (2d Cir. 1998). However, California law offers greater protections for brokerage customers. In California, "[c]onfidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another," and therefore, "[t]he relationship between broker and principal is fiduciary in nature and imposes on the broker the duty of acting in the highest good faith toward the principal." <u>Twomey v. Mitchum, Jones & Templeton, Inc.</u>, 69 Cal. Rptr. 222, 236 (Ct. App. 1968). In <u>Duffy v. Cavalier</u>, 259 Cal. Rptr. 162 (Ct. App. 1989), the court emphasized that under "long-established California law," a stockbroker owes a fiduciary duty even to "a customer who is a 'sophisticated' investor," even if the stockbroker does not control the investor's account. <u>Id</u>. at 167. Therefore, a securities broker can owe a fiduciary duty to a client under California law.

The scope of the fiduciary duty is a highly fact-sensitive inquiry that "depends on the facts of the case." <u>Id</u>. at 171. In <u>Duffy</u>, the Court emphasized the while "[t]here is in all cases a fiduciary duty owed by a stockbroker to his or her customers[,] the scope of this duty depends on specific facts and circumstances presented in a given case." <u>Id</u>. at 172 n.6 (emphasis omitted). Factors such as "the relative sophistication and experience of the customer; the customer's ability to evaluate broker's recommendations and exercise an independent judgment thereon; the nature of the account, whether discretionary or nondiscretionary; and the actual financial situation and needs of customer" all affect the scope of fiduciary duty. <u>Id</u>. <u>See also</u> <u>Rosenthal v. Great</u>

12

Western Fin. Sec. Corp., 58 Cal. Rptr. 2d 875, 893-94 (1996) (examining factors such as the length of acquaintance between the parties, whether an ongoing relationship existed between the parties, and whether an agency relationship had been formed, in order to determine the scope of fiduciary duty).  Therefore, the existence of a fiduciary duty often cannot be decided on the pleadings.[5]

Williams has alleged facts sufficient to entitle him to enter evidence on the scope of the fiduciary duty owed to him.  In Vucinich v. Paine, Webber, Jackson & Curtis, Inc., 803 F.2d 454 (9th Cir. 1986), the court stated that a broker would breach his fiduciary duty if he failed to monitor his client's account and give proper advice about changes in the relative strength of a stock such that the client's risk of margin calls increased.  Id. at 460-61.  In Duffy, the court upheld a jury verdict based on a stockbroker's breach of fiduciary duty to plaintiff, a trustee of pension trust fund, where the stockbroker persuaded plaintiff to make a large purchase of call options that rapidly declined in value.  Duffy v. Cavalier, 264 Cal. Rptr. 740, 745 (Ct. App. 1989).  Here, plaintiff has similarly alleged that in his circumstances, given the complexity of the transaction being proposed and the time-sensitivity of the deal, he necessarily relied on the broker to recommend a suitable strategy for his situation.  Under California law, assuming plaintiff can present sufficient evidence of the accuracy of his allegations to survive summary judgment, the validity of this contention is to be decided by the factfinder.  Therefore, defendant's motion to

---

[5] Plaintiff's argument that the existence of a fiduciary duty is *always* a question of fact, and not susceptible to attack at the pleading stage, sweeps too broadly.  (See P. Mem. 9-10.)  If plaintiff fails to assert sufficient facts to raise the issue of the presence of a fiduciary duty, or if it appears beyond a doubt that plaintiff can prove no set of facts that support his claim that would entitle him to relief, then plaintiff's complaint must be dismissed on the pleadings.  Haverstraw v. Columbia Elec. Corp., 237 F. Supp. 2d 452, 454 (2d Cir. 2002).

dismiss the claim of breach of fiduciary duty is denied.

IV.    Constructive Fraud and Negligent Misrepresentation

A claim for constructive fraud "comprises any act, omission or concealment involving a breach of legal or equitable duty, trust or confidence which results in damage to another even though the conduct is not otherwise fraudulent." Salahutdin v. Valley of Cal., Inc., 29 Cal. Rptr. 2d 463, 466 (Ct. App. 1994) (emphasis omitted).  In California, constructive fraud is a unique type of fraud that requires the existence of a fiduciary or confidential relationship.  "[T]he failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud." Id.  A plaintiff must also prove actual reliance and causation of injury.  Tyler v. Children's Home Soc'y, 35 Cal. Rptr. 2d 291, 312 (Ct. App. 1994).

Negligent misrepresentation is a form of actual fraud, consisting of a "positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true." Furla v. Jon Douglas, 76 Cal. Rptr. 911, 915 (1998).  The elements of a claim for negligent misrepresentation are:  (1) an assertion of a fact that is not true, by one who has no reasonable ground for believing it to be true; (2) intent to induce reliance; (3) justifiable reliance; and (4) resulting damage.[6] Cf. Bily v. Arthur Young & Co., 11 Cal. Rptr. 2d 51, 74 (1992).

---

[6] The elements of constructive fraud and negligent misrepresentation are similar under New York law.  See Burrell v. State Farm & Cas. Co., 226 F. Supp. 2d 427, 438 (S.D.N.Y. 2002) (citing elements of a constructive fraud claim); Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 788 (2d Cir. 2003) (citing elements of a negligent misrepresentation claim).

First, defendant contends that plaintiff's claims of constructive fraud and negligent misrepresentation fail as a matter of law due to the absence of a fiduciary obligation. (D. Mem. 10 n.6.) This argument fails, since under California law, DBSI may owe a fiduciary duty to Williams.

Second, defendant argues that plaintiff's claims fail because justifiable reliance is precluded by the representations made by plaintiff in the written contractual documents, specifically the disclaimer and merger clauses in the Forward Sale Contract. (D. Mem. 10-11.) It is often true that a party is bound by contractual understandings in documents that she signed and is presumed to have read. See, e.g., Pacific State Bank v. Greene, 1 Cal. Rptr. 3d 739, 746 n.3 (Ct. App. 2003) (finding that provisions constituted a merger clause, making "each agreement the final, complete, and exclusive statement of the terms of the parties' agreement"). However, as discussed above, the contractual exchanges of promises and warranties were extended between Williams and Deutsche Bank AG. Williams made no similar representations to his broker, DB Alex.Brown. The contractual clauses on which DBSI relies are thus inapplicable to the relationship between Williams and DB Alex.Brown, and do not prevent Williams from alleging justifiable reliance.

Williams argues that he reasonably relied on DB Alex.Brown's advice in proceeding with the forward sale transaction. A finding that plaintiff justifiably relied on the advice of his broker, though, may be substantially undermined because plaintiff was, in fact, provided with written documents that explained the facts that he claims his broker at DB Alex.Brown should have provided, even if he failed to read them. Cf. Rosenthal, 58 Cal. Rptr. 2d at 892 ("If a party, with such reasonable opportunity, fails to learn the nature of the document he or she signs, such

'negligence' precludes a finding the contract is void for fraud in the execution.")  This does not

defeat plaintiff's claim, however, but merely raises questions of fact regarding the extent of the

documents' disclosures, plaintiff's actual reliance on his broker's advice, and the reasonableness

of any such reliance.  California cases "have consistently taken the position that where a plaintiff

is unfamiliar with the nature of the documents used in the stockbrokerage business and is

deceived as to the nature and effect of the documents, failure to read the documents is

excusable."  Lynch v. Cruttenden & Co., 22 Cal. Rptr. 2d 636, 639 (Ct. App. 1993).   The

presence of certain representations and information in the agreement therefore do not preclude

plaintiff's claims as a matter of law.

In any event, a reasonable fact finder could conclude that the disclosures cited by

defendant are belated and cryptic.  Williams alleges that the forward sale transaction was

unsuitable to his alleged financial objectives because he expected Cisco's stock price to rise.

According to the complaint, Williams wanted to preserve his ability to profit from any potential

increase in value, but DB Alex.Brown failed to disclose the details of the transaction that would

limit his gains, specifically that he would only profit from the first $2.12 of any rise in Cisco's

price.[7]  Defendant contends that the contract documents disclosed these facts, but none of the

documents received by plaintiff before he entered the transaction disclosed the actual extent to

which plaintiff would benefit from a subsequent stock price increase.  Defendant relies primarily

---

[7] Defendant denies plaintiff's portrayal of the forward sale transaction, and asserts that
testimony from Maierhofer and Paul Somma, a DBSI employee in New York, will demonstrate
that the transaction was carefully explained to plaintiff orally.  (D. Mem. In Opp. To Motion To
Transfer Venue ("D. Mem. Transfer Venue") at 12-13.)  Defendant properly does not raise this
argument in its Motion to Dismiss, as factual disputes cannot be resolved by a motion to dismiss,
which addresses only the legal validity of plaintiff's claims.

on the Confirmation Letter, which was sent to plaintiff after the transaction was accomplished. (<u>Compare</u> Schumacher Decl. Ex. A (Forward Sale Contract signed on September 30, 2002) <u>with</u> Schumacher Decl. Ex. D (Confirmation Letter dated October 1, 2002)).  While defendant is correct that this document is expressly incorporated by reference into the Agreement, that incorporation cannot change the fact that Williams could not have read or relied upon the Confirmation Letter before he entered the transaction.

Even if it had been provided to plaintiff before he signed the Forward Sale Contract, moreover, the Confirmation Letter is unclear.  The document does contain a reference to a "threshold price" of $12.70 (Schumacher Decl. Ex. D at 2), which defendant asserts should have informed Williams of the limit on his ability to profit from a price increase.  However, the document contains no discussion of what a threshold price is; for that, plaintiff would have to revert to the Forward Sale Contract, which contains only a simple definition without an explanation of its significance or how it operates to limit the gains that Williams would recover. (<u>See</u> Schumacher Decl. Ex. A at 14.)

Similarly, an entry in the Confirmation Letter states: "participation 0.00%."  (<u>See</u> Schumacher Decl. Ex. D at 2.)  This, defendant argues, should have alerted plaintiff that he would not "participate" in gains from a jump in Cisco's share price, but the term is also not explained, either in the Confirmation Letter or by any cross-reference to other documents.  Since the parties agree that Williams would benefit to the extent of the first $2.12 in gains (<u>See</u> D. Mem. 6), the phrase "participation 0.00%" certainly does *not* mean that plaintiff would not "participate" at all in any stock price gains, in the sense in which the parties have used the term in briefing these motions.  Given the absence of any indication of whose "participation" in what is

pegged at zero, and because of the other possible meanings of "participation," the statement in

the Confirmation Letter is ambiguous. (P. Mem. 20.) In light of the ambiguity of an allegedly

critical term of the document, and the after-the-fact nature of the Confirmation Letter, Williams

may well be able to demonstrate that he could reasonably have relied on DBSI's advice, despite

the written documents he received. See Blankenheim v. E. F. Hutton & Co., 266 Cal. Rptr. 593,

600 (Ct. App. 1990) (holding that documents that did not fully explain the nature of the risk of an

investment supported a finding of justifiable reliance by plaintiffs on defendant's advice).

Therefore, plaintiff's claims of constructive fraud and negligent misrepresentation cannot be

dismissed as a matter of law.

V.       Unfair Competition

        Plaintiff alleges that defendant's actions constitute unfair competition within the meaning

of California Business and Professions Code § 17200. This statutory provision does not apply to

securities transactions. In Bowen v. Ziasun Techs., Inc., 11 Cal. Rptr. 522 (Ct. App. 2004), a

California appellate court addressed the applicability of § 17200 to a securities transaction

induced by misrepresentations by a securities brokerage, an issue of first impression for the court.

Section 17200 is viewed as California's "little FTC Act," as it mirrors language in the Federal

Trade Commission ("FTC") Act. Id. at 529. Finding that historically the FTC has not viewed

the FTC Act as reaching securities transactions, the court similarly found that § 17200 did not

reach securities transactions, a decision in accord with those in fifteen other jurisdictions

reviewing analogous consumer protection statutes. Id. at 530. The court specifically

distinguished another case examining a claim under § 17200 against a brokerage firm, Roskind v.

Morgan Stanley Dean Witter & Co., 95 Cal. Rptr. 2d 258 (Ct. App. 2000), as that case only

reached the issue of whether § 17200 was preempted by federal securities laws, but did not discuss whether § 17200 applied at all to securities transactions. Federal courts examining § 17200 have similarly found it inapplicable to securities transactions. See, e.g., Dietrich v. Bauer, 76 F. Supp. 2d 312, 351 (S.D.N.Y. 1999); Perera v. Chiron Corp., No. C-95-20725 SW, 1996 WL 251936, at *5 (N.D. Cal. May 8, 1996). Therefore, as a matter of law, plaintiff's § 17200 claim must be dismissed.

VI.    Negligence

Plaintiff properly states a claim for negligence. In order to establish negligence, a plaintiff must establish four elements: (1) existence of a duty; (2) breach; (3) causation; and (4) damages. Ileto v. Glock, 349 F.3d 1191, 1203 (9th Cir. 2003). As discussed above, plaintiff properly alleges that defendant owed a fiduciary duty, and this encompasses a duty of care to the plaintiff.[8] Plaintiff alleges that defendant breached this duty by failing to properly inform him of relevant aspects of the Forward Sale Contract, causing plaintiff to suffer damages, specifically the failure to benefit from substantial gains of his stock. Plaintiff's negligence claim thus survives defendant's motion to dismiss.

VII.    Transfer of Venue

Plaintiff moves to transfer venue to the Northern District of California, pursuant to 28 U.S.C. 1404(a). Plaintiff argues that that the balance of convenience of the parties and witnesses warrants a transfer of venue. That motion will be denied.

---

[8] Under New York law, a securities broker also owes a duty of reasonable care to a client, even with respect to non-discretionary accounts. De Kwiatkowski v. Bear Stearns & Co., Inc., 306 F.3d 1293, 1305 (2d Cir. 2002).

Defendant opposes a venue transfer, relying mainly on the forum selection clause in the contract, which provides that claims are to be adjudicated in New York. (D. Mem. Transfer Venue at 8-10.) The discussion above demonstrates why that reliance is misplaced. (See Part II.) DBSI is a signatory to the contract containing the clause, but its signature is expressly limited solely as an agent for Deutsche Bank AG, in its capacity as a counterparty to the transaction. (Schumacher Decl. Ex. A at 15.) DBSI is sued here only for the actions of its employee Maierhofer and its division DB Alex.Brown, in its capacity as Williams' stockbroker and financial advisor. As discussed above, the claims here do not arise from the contract, but from the actions of DB Alex.Brown/DBSI/Maierhofer in advising plaintiff to enter such a transaction. (See P. Mem. in Support of Motion to Transfer Venue ("Venue Mem.") at 2.) Additionally, § 1404(a) "is intended to place discretion in the district court to adjudicate motions for transfer." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988). Therefore, even if the forum selection clause were relevant, its presence, while significant in a court's analysis, is not controlling.

Nevertheless, even though the forum selection clause directing litigation to New York does not control, the Court declines to transfer the case. While many of the events relevant to that claim took place in California, the transaction also involved players in New York, such as DBSI's employee Paul Somma, who allegedly explained the terms and conditions of the forward sale transaction to Williams, including the floor and threshold prices. (D. Venue Mem. at 5.) In a modern financial transaction, it is quite common for witnesses and documents to be located in various places. Most of the key California witnesses are affiliated with one or the other party. On the other hand, Somma, ostensibly a key witness, is no longer employed by DBSI and current resides in New York, and the parties would be unable to force him to appear in California. (D.

Venue Mem. at 13.)  The calculations of witness convenience put forward by the parties are, as they commonly are, somewhat artificial, since it is too early to know which witnesses will be "central" or "peripheral" to the trial, and the vast majority of cases never require a trial anyway. Discovery will surely be conducted on both coasts, without great inconvenience to anyone

A transfer of venue always involves additional delay and complication.  Such delay has already ensued.  This case was brought in New York in the first place because the California state court stayed plaintiff's original action in favor of litigation here, based on the forum selection clause.  Plaintiff has appealed that court's decision, while simultaneously pursuing this action, which in turn has embroiled this Court in the fencing over the appropriate forum.  If the California appellate court, like this Court, disagrees with the state trial court's reading of the forum clause, plaintiff might very well withdraw his federal action and proceed with the case in the California state courts.  But one way or the other, there will be litigation somewhere, and there is no reason why discovery should be further delayed.  For now, it is far more efficient to commence discovery here, rather than to involve yet another court – the United States District Court for the Northern District of California – in addressing issues that have already occupied the California state courts and this Court.  Should it appear, at a later stage of the litigation, that the case will need to be tried, and that it can be tried more efficiently in San Francisco, plaintiff's motion can be renewed.  At this point, plaintiff's motion to transfer venue is denied.

## CONCLUSION

Accordingly, defendant's motion to dismiss is denied, except as to the California statutory claim for unfair competition.  The motion to transfer venue is also denied.

SO ORDERED.

Dated: New York, New York
      June 13, 2005

                                       GERARD E. LYNCH
                                United States District Judge